J-S53016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: U.S.B., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.W., MOTHER | : : : : : : : | |
| | : | No. 1017 EDA 2019 |

Appeal from the Order Entered March 20, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000217-2018

BEFORE: OLSON, J., STABILE, J., and NICHOLS, J.

MEMORANDUM BY STABILE, J.: **FILED DECEMBER 31, 2019**

M.W. ("Mother") appeals from the March 20, 2019 decree in the Philadelphia County Court of Common Pleas involuntarily terminating her parental rights to her daughter, U.S.B. ("Child"), born in February of 2017.[1] Upon review, we affirm.

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court found as follows.

> On February 25, 2017, the Philadelphia Department of Human Services ("DHS") learned that three week-old Child and her parents resided in a three-story rooming house and that Child was left unattended for hours while Mother and Father smoked marijuana on the porch of the rooming house. DHS was familiar with the family and aware that Mother's parental rights had been terminated as to Child's older sibling on May 26, 2011. On April 14, 2017, a General Protective Services ("GPS") report was issued

---

[1] By separate decree on March 20, 2019, the trial court involuntarily terminated the parental rights of Child's putative father, A.B. He did not file a notice of appeal.

after Mother requested that Child be placed in foster care because she was about to lose her house. The GPS report also alleged that Mother was mentally unstable[,] and Mother was not taking prescribed mental health medication. In the past, Mother had voluntarily admitted herself at the Belmont Center for Comprehensive Treatment for post-partum psychosis, depression and hallucinations. The GPS report alleged that Mother was unable to meet Child's needs[,] and that Mother and Father were experiencing domestic abuse issues.

On April 27, 2017, following a hearing, Child was adjudicated dependent. The [c]ourt ordered that Mother be referred for a Parenting Capacity Evaluation ("PCE"). On October 5, 2017, the trial court found that aggravated circumstances existed since Mother's parental rights had been terminated on another child and ordered that no reasonable efforts were to be made to reunify the Child with Mother. On January 17, 2018, the Community Umbrella Agency ("CUA") identified Mother's parental objectives, which were (1) Mother continue to take psychotropic medications; (2) to attend mental health treatment and (3) to seek housing. The underlying Petition to Terminate Mother's Parental Rights to Child was filed on March 19, 2018. On [March] 20, 2019, after hearing,[2], [3] the trial court ruled to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1)(2)(5) and (8) and found that termination of Mother's parental rights was in the best interest of Child pursuant to 23 Pa.C.S.A. § 2511(b).

Trial Court Opinion, 7/2/19, 2-3 (citations to record omitted).

_____

[2] During the hearing, Child was represented by her Child Advocate, Frances Odza, Esquire.

[3] DHS presented the testimony of Jeremy Kohut and Tamika Gillard, CUA caseworkers; Magalie Clamie, the CUA caseworker who supervised Mother's visits with Child; and Dr. Erica Williams, a licensed psychologist and the director of forensic services at Forensic Mental Health Services, who performed the PCE on Mother. Mother testified on her own behalf.

Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal. The trial court filed its Rule 1925(a) opinion on July 2, 2019.

On appeal, Mother presents the following issues for our review:

1. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)[?]

2. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of Child as required by the Adoption Act, 23 Pa.C.S.A. § 511(b)[?]

Mother's Brief at 5.

Our standard of review is abuse of discretion, as follows.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, we conclude that the certified record supports the decree pursuant to Section 2511(a)(2) and (b),[4] which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

---

[4] This Court need only agree with the trial court with respect to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Based on this disposition, we need not consider the decree pursuant to Section 2511(a)(1), (5), or (8).

- 4 -

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further, the grounds for termination of parental rights

under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), we have explained, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

Mother asserts on appeal that the trial court abused its discretion in terminating her parental rights pursuant to Section 2511(a)(2) because she complied with her permanency plan objectives. In its Rule 1925(a) opinion, the trial court countered, "Although Mother was clearly willing to try to meet her [permanency plan] objectives[,] she remained incapable of caring for Child. Specifically, she has significant mental health issues which have not

- 6 -

been remedied." Trial Court Opinion, 7/2/19, at 5. We discern no abuse of discretion.

Mr. Kohut, the CUA caseworker, testified that Mother's permanency plan objectives required her to comply with medication management, to participate in supervised visitation, domestic violence counseling, parenting classes at Family School and a PCE evaluation, and to obtain housing. N.T., 3/20/19, at 15. Mr. Kohut testified that Mother was in full compliance of her permanency plan. *Id.* at 22. He testified*, inter alia*, that Mother receives ongoing mental health treatment. *Id.* In addition, in February of 2019, Mother entered into a two-year lease agreement for an apartment. *Id.*

However, Dr. Williams, who performed the PCE of Mother and issued a report dated February 28, 2019, testified that, because of her mental health instability, Mother does not have the capacity to provide safety or permanency to Child. *Id.* at 42. Dr. Williams explained on direct examination:

> [Mother] had a limited understanding as to why [Child] was removed from her care. Child [w]as not . . . provided care by Mother for very long and, during that time, there [were] concerns regarding Child's safety.
>
> Throughout the case of Child . . ., Mother has had mental health instability. She is diagnosed with multiple different diagnoses, but all similar to mood disorders or symptoms of psychosis.
>
> She's had these disorders since childhood and--
>
> THE COURT: What kind of disorders?
>
> DR. WILLIAMS:-- she mentioned schizo-[a]ffective disorder, as well as depression. Prior records note bipolar disorder, as well as schizophrenia, and each of those disorders have similar

- 7 -

symptoms. It's diagnosed based on which symptoms appear first, and how long they last.

So, depending on the course of her presentation, different hospitals have provided different diagnoses, but the consistent underlying factor is the mood disturbance, the depression, as well as the symptoms of psychosis that cause her to have paranoid ideation, and not react to reality the way to somebody else would react to reality.

THE COURT: Would this cause problems in raising the child?

DR. WILLIAMS: Unfortunately, yes. And in the case of [Mother], this is not something that an individual chooses to have [or] chooses to not be able to treat. She [has] done everything that [has] been asked of her. She is compliant with her mental health treatment.

She is receiving intensive intervention for this, and simply, what [is] currently available for treatment is not stabilizing her at this time.

[DHS COUNSEL]: Is there anything that could change your opinion?

DR. WILLIAMS: There's the potential, with the modification of treatments for this disorder, that something new could come out. However, at this time, there is nothing out on the horizon. She [has] received this level of intervention since she was a child. She [has] had the most intensive case management treatment for the last 10 years. . . .

. . .

THE COURT: -- there is no medication now that could help her?

DR. WILLIAMS: They have not found one that is a match for her, correct. So, she has had significant attempts of her current medication that she's on, and the program she's in [which] ensures [her] compliance.

However, she still presents with a thought disorder that would disrupt her ability to care for [Child].

*Id.* at 42-45.

For instance, upon inquiry by the trial court regarding the basis for her recommendation of supervised visitation, Dr. Williams testified that Mother's "mental status can shift rapidly, and she may or may not be interacting with . . . what is happening in the environment, as somebody else sees it." *Id.* at 45. Dr. Williams clarified, "So, it's difficult to know whether or not [Mother is] going to be seeing the world as it's happening with Child in her care. . . ." *Id.* However, if Mother's mental status shifts during supervised visitation, Dr. Williams stated that, under those circumstance, Child's "safety can immediately be taken care of." *Id.* Therefore, the testimonial evidence reveals that, despite ongoing intensive mental health treatment, Mother remains incapable of performing adequate parental duties.

Similarly, with respect to obtaining housing, Mother testified that she had been residing in her own apartment for approximately two months. *Id.* at 58. On cross-examination by the Child Advocate, Mother testified that she lives in an independent apartment in an apartment complex. *Id.* at 65. However, at the time of the PCE, Dr. Williams testified that Mother was residing "in a housing program where she has adults providing her care and making sure that she's well. . . ." *Id.* at 44. Dr. Williams recommended that Mother remain living in "supportive housing." *Id.* at 47. Therefore, despite Mother obtaining independent housing, the record is devoid of any evidence that Child would be safe in that environment.

Based on the foregoing, we conclude that the testimonial evidence supports the termination of Mother's parental rights pursuant to Section 2511(a)(2). Mother's mental health instability, from which she has suffered for most of her life, has rendered her incapable of performing her parental duties to Child since Child was approximately two months old. Despite ongoing mental health treatment and full compliance with her permanency plan, Mother remains incapable of performing her parental duties. The record supports the court's conclusion that the causes of Mother's incapacity cannot or will not be remedied.

With respect to Section 2511(b), Mother asserts that the court abused its discretion in terminating her parental rights because a bond exists between her and Child. We disagree.

As this Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should

- 10 -

> also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Further, our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In this case, the trial court found that terminating Mother's parental rights would not have a detrimental effect on Child. Rather, it would be in Child's best interest. The testimonial evidence supports the court's findings.

Tamika Gillard, the CUA case manager, testified that no parent-child bond exists between Mother and Child. N.T., 3/20/19, at 33, 36, 38. As such, she testified that Child would not suffer irreparable emotional harm if Mother's parental rights are terminated. *Id.* at 35.

Ms. Gillard testified that Child has resided in her current foster home for one year, and that she visits Child there once per month. *Id.* at 34-35. She

testified that she has observed a bond between the foster mother and Child in the form of Child "[h]ugging, laughing, talking, singing, asking for food, asking for drinks." ***Id.*** at 34-35.

Based on the foregoing, and the entirety of the testimonial evidence, the trial court did not abuse its discretion in concluding that terminating Mother's parental rights serves the developmental, physical, and emotional needs and welfare of Child pursuant to Section 2511(b). Accordingly, we affirm the decree involuntarily terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/31/19